Opinion.of the Court, by
Judge Mills.
THIS is an action brought by the Bank'against Cashier of one of the Branches and-his sureties in for official defalcation.
At the term next after process executed, and at-which the suit stood for trial; the defendants below, now appellants, applied for and obtained from the Judge, an order for a change of venue, and.-there were no pleadings filed at that term, on the part of the defendants.
At the first succeeding term of the court to which the cause was removed,'the defendants appeared, and after presenting a demurrer, which professed on its. face to crave oyer of the writ, declaration and bond. de. dared on, also filed sundry pleas in bar.
The court overruled the demurrer.
It is now insisted, that the demurrer ought to have., been sustained, because it appears that the writ was issued in the name of the President arid Directors of the . Bank of Kentucky, the declaration in the name of the. President, Directors and Company of the Bank, and the’ bond was.executed to the President and Directors of the Bank, of Kentucky only; and-it is insisted,.that-this, variance ought, to be held, fatal.
(1) Theprop-e[ f1.0*1® of . cr, is,nby§°y prayer enter-et on record, opposite party may coun-terplead, and decision of¶6 the court, whether oyer o/not — Ar^ °
When the pa-inte^ffstate-merit in the demurrer _ craveifand given, to which no .objection jrp-clent ■ and aftor decision, the ca=e oyerhadheen regularly ob-taiued.
1 Ancient_ .ly, iu Eng-l.nd, oyer could be era-ori-luitl writ at any siato, and a vari-fuiiid Uu'86” declaration, could bo ta-ta'kfi^foUlior in arrest of judgment or o.q error.-Ar.
(1) Before we answer this question, we will notice a previous one; ■ made in that court, and debated both there and here. The demurrer was argued and decided without paying any attention to the oyer craved 0f- the writ, as stated on the face of the detnuxrer, and of course it was taken as if oyer was given. Afterwards, the counsel for the plaintiffs belo.w moved the court to strike out the oyer craved of the writ, and to refuse thereof, which the court did accordingly, which is insisted to be erroneous.
The oyer craved of the writ and bond is not by art en(ry 0f récord, as it properly ought to have been, but is a bare statement on the face of the defendants’ dc¿ murrer, that oyer was craved and given,
This, according to the loose practice prevalent in ihe country, is frequently taken and treated by the parties and the court, as oyer, and may answer, where the pa~ pers are on file and to be seen before,
But it is evidcnt,'that if any paper was not produced, un application by prayer of oyer to the court on record alone will do. ' With this prayer the opposite party may. comply, or counterplead the oyer, and have the decision of the court thereon, whether oyer is to be given or not,
As this statement in the plea was treated as re at over °f record, we shall so consider it, although no oyer is craved on the order of the court; and we shall view court as deciding the cause, and then determining that °ypr of the writ couId n°t be given*
We do not conceive that the decision refusing oyer-ofthe writ, is any way calculated to prejudice the defendants, or preclude them from taking advantage of the variance. ‘
(2) In England, anciently, oyer o'f the writ could be demanded, and then the partv could either plead the variance or demur ¡n abatement. And as ojmr coum be cravec] at any stage, the consequence was, that the variance could be taken' advantage of at any stage, even lQ arrcf!| of judgment or upon a writ of error,
(3) This produced considerable mischiefs, and to remedy it, the courts ultimately refused to grant oyer tbe ^rii, or of the capias; and the consequence was, that there could be no demurrer in abatement, or plea of (he variance. This contest, however, must be con-g^ered as applicable to the original wfit^ which issued *173 out of chancery, as á warrant to the court to proceed, and not to the capias, which is similar to ours.
(3)1n mod-Knflwid'op-cris refused of either the and there can. bo there, no for the variance— '
uo ori. ginal writ. J*]le pUrpo8es of the original and mesne binceTand™' necessarily composes %***£{ with* O.utoyer. Therefore, it not error to refuse it.
[^batemeat for variance between the jHtbe spirit of the act limit-jpg dilatory^ pibas and see-cial dernm--¿¡rsuín/ap. pointed for the trial, and, therefore, cannot after-™*bere-
*173 (4) Here, however, we have no such original writ, and our capias answers all the purposes of their original and rneSne process combined. It has been decided, at an early period in this country, that this capias composes a part of the record. See Litt. S. C. 10. This decision has been followed and virtually sanctioned ever since, and it is now too late to overturn it.
i he capias, then, being a part of the record, it is en-iirely nugatory to crave oyer of it. It is futile, to ask that to be spread on record, which is already a part of it. It cannot, then, be wrong, fora court to refuse the idle ceremony of- oyer; nor does the decision of the court refusing oyer, make the writ less a paid of the record, than it was before. The decision on this point was correct.
(5) It is then insisted, if this writ is to be considered as part of the record, it follows, that the variance will always appear, and can be taken advantage of at any stage of the caus.e, as was the case in England, when oyer was granted, and therefore the variance ought to be held fatal on this demurrer.
However natural this conclusion may be, we are unwilling to go the whole extent to which it would lead us, and are tempted, liko the courts of England, to place some reasonable limitation on it, and lessen the conse-quencos of the doctrine which admits the writ to be part of the record, beiore or without oyen
Dilatory pleas and special demurrers to the declaration are limited, by the act of assembly, to the first day appointed for 4the trial of the cause, after the return of process executed. Although the letter of the act may not embrace a demurrer in abatement, for variance between the writ and declaration, yet its spirit will not permit such demurrers to escape.
The law permits the party either to plead the variance, in some cases, or demur in abatement. If he elects to plead, after the first day of t rial, he is precluded from doing so. If he takes another mode to reach thesame object, it must be equally within the mischiefs intended to be avoided; and, therefore, the practice of demurring in abatement must be limited to the same boqr as pleas are., which attempt the same thing.
a demurrer is first datefhoS suit was set far trial, tho’ there be a va-munoo h»_ it will bo ta-treated^as in bap, riance between the ■writ and declaration, and that insisted on in abatement,
[7] In an ac-°r" potation, a variance between the name in the writ and declaration, is no cause of demurver, but of plea in abatement.
onf'be'es-011 tablWed by ‘ Ara;u [8.1 In this state, as cor-legislative act, all of which (he courts must know, they may be bound to know, judicial!}’, the names of all so created.—
[9] In Eng-lamí, corpo-rati«-is -were by private ^mntífrom the^rown™ were not Íuílicia% itnown; hence ¿asno-mor iñ their cases had to Arfm^"
*174 (6) We, therefore, conceive that no such demurrer ought to be afterwards allowed to abate the suit, but must be taken as a general demurrer to the merits and substance of the pleading. This demurrer, then, was, filed too late, and cannot avail the defendants below, so far as ¡¡; js re,]jed on for the abatement of the suit because of a misnomer of the corporation in the writ, even if the matter could be reached by demurrer,
(7) Bat we are not disposed to ad'mit that the party here could demur for the variance, and conceive that he was bound to plead it specially; and such was. the ancient rule with regard to corporations.
t (8) It may be insisted, that no corporation can be established in this State, but by act of assembly, and that according- to our laws, the court is bound judicially to. notice and to know every act of assembly, whether public or private, and therefore must judicially know the. name of every corporation here,
(9) Whereas, in England, corporations created by private statutes could not be known judicially, but by plea, as well as those which existed by charter from the-aCrown; and, consequently, the party must, there sefe out by plea, the true name,, to which the other might reply another corporation by the name sued on; and? this was the reason why a plea there was necessary. But here, a& the law is different, the maxim .applies,, ralione cessante, cessat etiam lex-
(10) To this we. answer,, that notwithstanding this, change of law, the reason which requires a plea, and; forbids the touching of the question by a demurrer, has not entirely ceased. Corporations granted entirely by ^le Crown, before the revolution, may still exist in Yirt ginia or here, as we were part of Virginia.
(11) Moreover, the corporations granted and incorporated by our own State, are not the only ones which can sue or be sued in our courts, and have rights ex-,,-isting here, which can be asserted by the laws of this, country. The contrary may be considered as law, ac-v cording to the decisions of (he supreme court of the-United States, and Silver Lake Bank vs. North, John. Chan. Rep. 370. It would be treating our sister States. with an unjustifiable want of comity, which the laws of the Union would not justify on our part, to exclude all their corporations from asserting their rights in gue1, Chan. Rep. 370. ... *. .... courts.
[10] Corporations f/reivbytho crown of England, bo-í°¡i? therey0" still exist in Kentucky.—
cor porationsof" our sister en* in0ur court's; —Argu.
L12] Ascot-. P<;r.a*10ns which the courts cannot judicially their names, may sue in °".r courts, a canncrtbe reached by demurrer,but J^g^ied
f" 13J If the court,in this casc,judi-that^the well j£nown Bank of Kentucky, incorporated bythelawsof plaintiff they would notice that it was called by its lull name in the do- and^rirl had been'lei't out in the Arsü-
*175 (12) As-, then, corporations which we can, and those ■which we cannot judicially know, by their names, may still sue here, the reason still exists for, holding the party to his plea in abatement, for a variance or misnomer of a corporation, and for precluding his reaching it by a demurrer.
(13) Besides, if we can judicially know that the party here intended the well known Bank of Kentucky, corporated by the laws of this State, in the writ and declaration, in the latter we are bound to know that it is rightly named, by its full corporate name, and that in the former is left out part only of the corporate name by which it is known.
(14) This brings us to the question that has been largely insisted on, that the part omitted in the writ is substantial, and not matter of form, and therefore the demurrer ought to be sustained.
■It has been insisted, that the company is the sub-stonee of the corporation, and the President and Directors only the agents. I he company may be entitled to the funds, or most of them, it is true; but the President and Directors are the efficient and active part of the corporation, known in law, and, therefore, naming them includes the most substantial part. And although the want of the company in the writ might have abated it, if taken in a proper time-and mode; yet, as that was omitted, the declaration has cured the matter, and the action cannot abate by demurren
(15) It has been seriously urged, that as the bond - . was given to the President and Directors only, and does not, in its obligatory part, include the company, it is void- ... - . .
. It is so repugnant to the principles of justice, to permit parties contracting with corporations, to avoid their contracts, and corporations to avoid their own grants, for small errors and omissions in stating the .cor-poratename, that we should be unwilling to adopt such a principle, unless compelled by the settled doctrines of hu.
It is true, many cases are"found where courts tolerated the rule; but it was reprobated and shaken by Lord Coke, 10 Rep. 123, and since then, the rule is adopted, that such grants and contracts are good, and that it is competent for the party to aver that they were executed to or fey the corporation, and if the fact shall *176 (has appear, all such contracts shall be good; If not executed to the corpondion, it will be competent for defendants to traverse, and try this averment; and if found for them, they will be discharged. We do not, therefore, conceive this bond to be void; and as the corporation is rightly named in the declaration, and it is stated that the defendants made' and executed this obligation to the plaintiffs, we deem it sufficient, and fqle 'demurrer ought not to have been sustained on that . ° ptimt. • ,
[14] For thb omission in njV’ in the corporate Bank of Kentucky, it might, ifta-kenm proper time and mode, be abated; hut full mime, the action cannot be murrer.
ri5l ybond to the presi-dentanddi-pariy) of the BankofKon-tucky, is not acüonumy11 be maintained upon it in full name, by thedeoiam-tjon,.that it was executed corP°-
*176 It is further insisted, that the breaches assigned are S00^7 allc^ ^hey !UC *-°0 gcllcrul 1° show cause of action. This is an action of covenant on the bond, the stipulations are:
“ That the said James T. Pendleton shall well and faithfully discharge all and singular the duties of his said 0$ce of cashier, and abide by the rules and by-laws of said institution.”
anc* singular the duties of his said office of cashier; nor did he abide by the rules and by-lams of said institution, during his continuance in office, to wit, from the date when ^[58 bond was executed, until the. ■ — davof-; but the same to do, hath wholly failed. He hath, dur-The breaches assigned, are: “That the said James T. Pendleton did not well and faithfully discharge all ing.said time, used, and wasted, and misapplied the sa^ Bardslown Branch Bank, contrary to Bie rules and by-laws of said institution. Nor have the said defendants paid the plaintiffs the said sum of fifty thousand dollars,” (the penalty of the bond,”) “ or any Part thereof.'’
(16) ^ 'a a verJ §eaeral ru^e' funded in the sound-est maxims of go'od sense, that it is sufficient, in affirm-alive covenants, stipulating the performance of any (^° state the non-performance in the words of the covenant. This declaration having done so, and there-by having shown a subsisting cause of action, we can-not say that the rule does not apply here, and we can--not sce anJ reason for requiring greater particularly,
(17) But it is contended, as the bond refers to the bj’-iaws, and the breaches assigned accuse Pendleton ‘ noií.comp]¡ance (herewith, it was necessary to set out these by-laws, as they were oí a private character and cannot be noticed as public laws.
[i6] Thcgen-eral rule that -in unaSf tívécovenaúi fortheper-formanceofa Writhe &S" breach in the worth of the Úpplie™ kÚáh action on a bond condi-fÚithihí'dJ-110 charge of the duties of a ÚÚníc01' °fa ‘
• • e °" mission to set out the bylaws of the ^híohüiodé-fendant cov-enantedto wMchtheand broachcharg-eshe did not comP]y with, objection or not, cannot generaf de-° murrer, there being other Is assigned*
^,8, a corporation, in pursuance Úcquirinú^thc bonds «fits «¡fleers to ¡h¡ ^"od^witU aproviso iu the ordinance t!ef-U shan not impair the obligation of any ' protions ^ bond, until given up to be cancelled, first, with rom i ion or time, that its conditions iormoir'until the second boiul was de-liverud. takes a second bond, without can-celling the first, it cannot be pleaded in an action on the first, with roml tlie discharge efthe duties ol’ the office, without saying for what
*177 If it be conceded, (which is not intended,) that it was necessary for the plaintiffs to set out these by-laws, we do not perceive how the want of them would avail the defendants on a general demurrer; for if this breach is bad, there was at least one good breach, and the rule is too well settled to be shaken, that where there is one breach good, a demurrer to a declaration must be overruled, although there be numerous bad breaches.
(18) The next question presented for our consideration, arises out ofa plea of the defendants. It is to this offect: That an ordinance of the corporation had provided that the office bond of the cashier and clerk, should be annually renewed in the month of January; that pursuant to said ordinance, in some month of January succeeding this bond, the cashier had executed a new bond, with sureties different from those in this bond, which new bond was received and approved of by the president and directors, and retained by them, “ when the bond in the plaintiffs’ declaration ceased to beob-ligatory,for any violations by the said Pendleton of his duties as cashier, committed after the date of’the nezo bond.” They then aver that they kept and performed each and every of the covenants contained in the writing declared - Ihis plea made up to the date of said new bond, profert of the ordinance recited.
The plaintiffs claimed and had oyer granted of the ordinance, and demurred, and the court overruled the plea.
The ordinance has a proviso annexed thereto, after directing the renewal of the bond, in the following words: “ Provided, however, that such renewal, or any thing contained in or growing out of this section, shall not impair the obligation of any previous or other bond, until actually given up to be Cancelled by the board of directors. The security required of each, shall he approved by the president and directors of the branch, and a copy of the bond and a certificate that the seen-rity has been approved as aforesaid, shall be transmitted to the president of the Bank of Kentucky.”
The question made and insisted on by the appellants on this demurrer, as well as on the evidence, is, that on giving the new bond, the old one was substituted and discharged as to future defalcations, and could only be detained to secure defalcations which had taken place " *178 before fciie new bond was executed, and had no furthei obligation.
An obligee maytakeany number ofab-ligations persons to se-curo the same demand; and unless one is accepted in accord and satisfaction of the rose, and perhaps even then, .all re-maininforce,
*178 It is certain that an obligee may receive as many ob-igationsas hé pleases, from different persons, to secure the same demand, and unless one is expressly accepted ^11 !lccor(^ and satisfaction of the rest, they are all in force, aüd it is not, a clear ‘point that even such acceptance would discharge them. In this casé, there is a complete neg;lllve placed on the supposition that one was taken ^”01' ^le other.
And moreover, there is ftn express declaration, or w\la(- [a tantamount thereto, that the obligation first giv-eil) shall remain the same. It shall not be “ impaired f’’ that is, it shall not be weakened, lessened or rendered ¡n any degree worse than it was before.
It has been insisted} that good policy requires that the terms of the first bond should be shortened to the execution of the second; that a contrary doctrine enables banks to attach to each officer -a train of sureties, and thereby extend its circle of ififluene'e and obligation. It is true, (hat banks have it in their power, not only in this way, but by more extensive means, to extend their 0yj]j«iltjons on society. Still, this argument would be more suitably addressed to another department of government, when creating banks, than to us, when adjudicating on their contracts. Here, however, the contract sued on has no limitation in its terms. If no new bond had ever been executed, there could not have been any pretext for saying there would be any limit, and when the new one is executed, on terms which expressly secure the obligation of the first, it would be an arbitrary act to declare that the obligation of the first should cease at the date of the second,
(19) Besides, the execution of numerous succeeding bonds, which have multiplied the number of sureties, may operate to the benefit of the present defendants: for there is at least a plausibility-, it not more, m supposing that a court of equity may consider them all as united into one bond, from the date of their acceding to the securityship, and compel them to contribute in case of the failure of the cashier.
In descending to the points made on the evidence, we do not deem it necessary to notice the questions presented on the part of the appellants, in their bills of exceptions, except the fifth and tenth, as all the rest have *179 been already noticed in principle, or were so correctly decided.by the- couit below, according to well settled principles, that there is no necessity of making them a subject of distinct consideration in this court.
subsequent bond is taken fojthe sams pior°one,Sa with a decía-ralion that tioVof the' first sha]]'not bo thereby extensive as if the other noi-becn d Pn‘
(19) Quore— not _ inffimt1" by hilt in^sqyity, TC'icooml to contribute to Pa.v the coveredfor" breaches dm-. ing the exis-tonco oí both.
a cashier and bis securities, bondiSc°ondial tionefl for the, faithful dis'charge of his dence.thathe. in his j^aracta-1 a draftonThe bank and anr cepted it for the bank, as cashier and sold.it for the money,and that it was to^bi^hjihe purchaser, with request hisPcroditl<is inadmissible, Cashiers in Kentucky^ had not poiver, ex officio, to accept the bank.
*179 (20) The question presented in the fifth exception, does not arise out of the land or grade of evidence which the court admitted to prove the facts. That was of a presumptive nature, it is true; but it was such as might properly be left to the consideration of the jury, under the caution given, by the coui;l,
But after the (acts which the evidence conduced to prove, are ascertained, their admissibility to charge the cashier and his sureties on his official,bond,, is very questionable. ^
^ They are to this effect: Pendleton,.the cashier, drew, in his individual character, a check or draft on the branch of which he was cashier, and then accepted it for the bank, as the cashier, and sold it to, and-received the amount therefor in money, from the branch bank of die United-States in Louisville.
The cashier of the latter bank, transmitted it to Pen-dleton, as cashier, with directions to carry it to Credit of the Bank of the United States.
If Pendleton ever received this draft, which disputed,fact, he never placed it on the books of his branch, to. the credit of the United States’ Bank, and nothing more was ever heard of it.
It was insisted that this created- a liability for so much, on the part of the Bank of Kentucky, by the act of Pendleton,‘its cashier, to the Bank of the United States, and, therefore, Pendletoii and his securities must account for it,
It will be readilyadmitted; (ha„t if Pendleton, by drawing and accepting the draft, did create a liability on the Bank of - Kentucky, which the Bank of the Unit.ed States could enforce, he and--his sureties ought to be made liable hcrc- ' ’
But we are.unable to..perceive any proof,.conducing to sh.ow apy liability on this bank, to pay,"the.amount of this draft. - ’
(21) It is true, the charter of the bank does author-Szs the president and directors to deal in bills of change. Whether this extends so far as to allow them to bo the acceptors.of bills, we need not now enquire; (or if it be conceded that they hav.e that power, andihat *180 they can transfer it to their cashiers or agents, in a proper mode, yet there is not the least evidence adduced to show that they had authorized Pendleton to bind them by acceptances.
theBank°ofh Kentucky h.id power to uepi oni»L, powertac»n-fer authority deal in bills of exchange; yet whether-power to accept or not, on its cashiers to do so or not, to prove the ' bank liable tange <Kone" of them, it must b.e shown he was tmtborizod to make it.
biuiifhqk no (22) Evidence that the n.ishi»r secreted bills 'in which the interest., or t^í^own3111 USe, isinad-missibfo. (^¿¡]]^]„° as tvhicli the • corporation an water-
*180 He was, no doubt, authorized, ex officio, to pay drafts an<I checks, when the drawer had funds, and when he had none, the payment would be a waste of the funds of the bank; hut to accept and create liabilities on tbtr kan]^ is a different thing.
(22) It is not shown that he had that power. Bc-sides, it did not appear that the Bank of Kentucky was' ever the owner of this draft. It belonged to another hank, and if the acceptancé was invalid, the imposition is on the purchasing bank; and as this bank had no in* terest in it, they cannot make the cashier liable, as for a breach of oflicial duty, however liable he may be to the bank who purchased the draft, for selling and then secreting the check, if it came to his hands,
This check is different, in circumstances, from another sold to the same bank, which was taken up and crea-ited t.o the United States’ Bank, by the cashier of the Eank of Kentucky, mentioned in the same exception, and also a third of $400, bought by the Bank of Ken-tur.ky, mentioned in another exception.
These two latter drafts became the property of the Bank of Kentucky, and if they were placed in the hands oí Pendleton and secreted by him, or applied to his purposes, it was a violation of his official duty, for which this action will he. Bat not so of the first, m v. hic;< the Bank of Kentucky uever had an interest.
(23) The defendants attempted to prove, that the no'es of the bank which Pendleton was accused of misapplying, were depreciated in value at the time, in order that the amount miuht be scaled to the standard value of the notes, in rendering the verdict. This testimony was rejected. As it does not appear that any evidence was introduced and heard, conducing to show that Pendb ton had wasted any of'the funds, except securities of the bank, which called for money, and notes of the bank itself, which bound the bank to pay specie, the exclusion of this evidence was proper and right, although the rule might have been different, if it had been shown that he had used any other funds of th§ bank which were depreciated.
Whnro the cashier applies to his callinr-ib”1* money or aot^s °!1 1!3e Wa« bound to par money, he is £ci¡ln ™n'™3 bond, for the-fill nominal to f)10”r " the netos on ^,(j3nu^s,‘ dopi-ocliiie,' in value, Kr' funds,
4) Admis-sionoftbc cashier nH.is funds of the bank, made oontinnauce in office, and receipt }£ ^bank'for*' money not brought into its accounts, is admissible in an action against him and his securities, on his official bond.
*181 These two questions are all in ibe bills of exceptions on the part of the defendants, which we think it necessary to notice.
As the judgment must be reversed on one of these points, we are led to notice some questions which were made on the part of the plaintiffs below, and decided against them, as we conceive, improperly, and which may again occur on another trial.
(24) Before the cilice of Pendleton terminated, the clerk, at the instance of the directors, made out a list of supposed charges against him, for funds not accounted for and misapplied, belonging to the hank, and presented it to Pendleton, who wrote explanations and admissions against every item, and signed his name thereto. This was rejected as improper evidence against the dc-fondants, and'weare unable to perceive any principle which will uphold this rejection. We only conjecture, that it must have been supposed that the acknowledge ments and admissions of Pendleton, while he was cash-ler, could not bind his sureties. This we cannot admit, Thry were bound, not for themselves, but for him, and his arts and sayings, of course, bound them, and they must stand or fall by them. This evidence, therefore, ought not to have been rejected. The same may be said with regard to the receipt of Pendleton, as cashier, endorsed on a replevin bond, which had been assigned to the bank, part of which was not brought into the accounts of the bank, or deposited therein.
(25) There was, also, three hundred dollars, which was placed in the hands of the cashier, to the credit of Benjamin Edwards, ns a deposit, given to Pendleton on the street, after banking hours were over, in his char-aeter as cashier, under his promise to place it to the credit of Edwards; also, five hundred and fifteen dollars of notes, issuad-by the branch hank and taken in by the mothor bank, were placed in the hands of Pendleton, as cashier of the branch, at the hanking house of the mo-Iher bank, to be carried by him to his branch, and there to bo placed to the credit of the mother bank; but which were never accounted for in the branch. These were also offered and rejected, and the only ground on which the rejection took place, as hinted in the record, is. that these payments were not made at the bank, in banking hours, but at other times and places. It is true, the officers of the bank may not be compelled, cither to ac- *182 ccpt or make payment, except in banking hours, and in some cases, at their banking house; but if they do so at other limes and places, and misapply (he funds of (ho bank, we have -no doubt they become officially liable, and their sureties must be responsible for such. acts. We view a cashier as holding his office at every time and place, and if, at any time different from hours of banking, or at places far remote from the ba nking-housc, he shall convert the funds of the bank to his own use, the institution has a right to recover such funds, on his official bond,
(25) A cashier holds his ■office at all times and places, and by misapplying funds delivered to bim for the bank, out of business hours and remote from the banking-house, violates the condition of his official bond, to faithfully discharge the duties of his office. '
(26) The bank was not liable for an omission to have a negotiable note deposited by another bank protested for nonpayment and notices given, though it was import ant to fis the endorsers, unless the costs of protest had been deposited, it appearing an ordinance oí the bank required it.
(26) We will only notice one other question. A note-made payable and negotiable at the branch, made by S. T. Beall and endorsed by Pendleton aiid another individual, and held by the Centre Bank of Kentucky, was deposited in the branch for collection, and when it became due, it was not protested for nonpayment, and notice given, whereby, as was supposed, the endorsers were discharged, and the Centre Bank claimed the amount from the branch, because the cashier, whose duty it was, had not had it protested. This note was. offered in evidence (o chargé the cashier and his sureties for the amount, and was rejected. We need not determine whether the branch bank could or could not make this note its own,by this neglect, when the branch, acted as agent only, out of mere courtesy.. It may have been important to the Centre Bank, to have this note protested; for if it was discounted by the latter bank, it assumed the grade of a foreign bill of exchange, to which a protest in case of non-payment, is all-important to fix the endorsers. But taking the ordinance of the Bank of Kentucky, permitting the deposit of such notes for collection, as fixing the extent of the engagement, it was necessary that the depositor should previously have deposited the costs of protest; and there is no proof (bal this was done by the Centre Bank, lis it was then necessary to show the liability to the Centre Bank complete, on the part of the Bank of Kentucky, befo'rc the amount of this note was charged against the cashier, the court below, on the state of proof, did not; err in excluding the item.
The judgment must be reversed with costs, and verdict set aside, and the cause be, remanded, with directions for new proceedings not inconsistent with this opinion.
June 15.
3*4 & Mary, in the 7°ars l55’'-'3-
Rowan, Bibb and Chápese, for appellants; B. Hardin, Wiclcliffe and Crittenden, for appellees.
The counsel for the securities of Pendleton, discontent with the opinion of the court, on the question of the validity of the bond on which the action was founded, moved the court for a re-hearing on that point, and in support of the motion, presented the following